RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 20a0378p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

REBECCA FOSTER,

　　　　　　　　　　*Plaintiff-Appellant*,

　　*v.*

THE BOARD OF REGENTS OF THE UNIVERSITY OF MICHIGAN; UNIVERSITY OF MICHIGAN; ALISON DAVIS-BLAKE,

　　　　　　　　　　*Defendants-Appellees*.

┐
│
│
├　No. 19-1314
│
│
┘

───────────────

On Petition for Rehearing En Banc

United States District Court for the Eastern District of Michigan at Detroit.
No. 2:17-cv-10781—Bernard A. Friedman, District Judge.

Argued En Banc:  October 7, 2020

Decided and Filed:  December 11, 2020

Before:  COLE, Chief Judge; MOORE, CLAY, GIBBONS, SUTTON, GRIFFIN, KETHLEDGE, WHITE, STRANCH, DONALD, THAPAR, BUSH, LARSEN, and NALBANDIAN, Circuit Judges.[*]

───────────────

## COUNSEL

**ARGUED EN BANC:**  Joshua Adam Engel, ENGEL & MARTIN, LLC, Mason, Ohio, for Appellant.　Stephen J. Cowen, JONES DAY, Detroit, Michigan, for Appellees. **ON SUPPLEMENTAL BRIEF:**  Joshua Adam Engel, ENGEL & MARTIN, LLC, Mason, Ohio, for Appellant.  Stephen J. Cowen, Amanda K. Rice, Andrew J. Clopton, JONES DAY, Detroit, Michigan, for Appellees. **ON BRIEF IN SUPPORT OF APPELLEES' PETITION FOR REHEARING EN BANC:**　Bryan H. Beauman, STURGILL, TURNER, BARKER & MOLONEY, PLLC, Lexington, Kentucky, for Amici Curiae.

───────────────

[*]Judge Readler and Judge Murphy recused themselves from participation in this decision.

SUTTON, J., delivered the opinion of the court in which GIBBONS, GRIFFIN, KETHLEDGE, THAPAR, BUSH, LARSEN, and NALBANDIAN, JJ., joined. MOORE, J. (pp. 16–40), delivered a separate dissenting opinion in which COLE, C.J., and CLAY, STRANCH, and DONALD, JJ., joined in full, and WHITE, J., joined in part. WHITE, J. (pg. 41), delivered a separate dissenting opinion.

———————————

## OPINION

———————————

SUTTON, Circuit Judge. Rebecca Foster suffered peer-on-peer sexual harassment while enrolled in the University of Michigan's Executive MBA program. At issue in this Title IX case is whether the University was "deliberately indifferent" to her plight. *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 647 (1999). It was not. At each stage, the University ratcheted up protections for her: from a no-contact order after the first complaint to a requirement that the harasser stay in a separate hotel for the program's last three-day session to a removal from the third day of the session to an order that he not attend graduation. That does not constitute deliberate indifference as a matter of law, and accordingly we affirm the district court's summary judgment decision in favor of the University.

I.

The University of Michigan runs an MBA program for business executives. Students attend classes roughly one three-day weekend a month at a hotel in Los Angeles. In August 2012, the program welcomed a cohort of 40 professionals for that year's new class, all slated to graduate in May 2014.

Toward the end of the program, on March 13, 2014, the University received a call from one of the students, Rebecca Foster, who reported that another student had harassed her. Foster filed an official complaint and submitted evidence of the harassment: emails, texts, and social media posts.

The University began an investigation. It interviewed Foster, who described her experience with the harasser. The two became friends through the program. In late 2013, the harasser, already married, began expressing romantic interest in Foster. During the October 2013

residency, he began delivering morning coffee to her hotel room.  At first Foster refused, but she eventually allowed him to come in and have coffee with her.  During the November residency, he told her that he "kind of love[d] her," and she "clearly" responded that she wasn't romantically interested in him.  R.48-10 at 4.  During the December residency, when he said he was "in love with her," she responded, "I do have feelings for you.  But it's because we're friends."  *Id.*

The harasser initiated "unwanted contact" with Foster.  R.44-4 at 7.  At the December residency, he "grabbed her butt" as she walked away from an elevator.  R.48-10 at 4.  When a group of students, including Foster and the harasser, went to a Michigan football game, the harasser rubbed her leg.  Days after the game, Foster, the harasser, and two others went to the Griffith Observatory, where the harasser, without invitation, kissed her on the cheek.

Things escalated during the weeklong residency in January 2014.  On January 6, Foster, "tired and worn down," kissed the harasser for 10 seconds in her hotel room.  R.48-10 at 5.  When he delivered coffee on January 8, she asked him to leave, but he instead "crawled into [her] bed" and tried to remove her clothes.  *Id.*  She got out of bed, went into the bathroom, and undressed to shower.  He came into the bathroom while she was naked and pulled down his pants.  She told him to leave, and he did.  On January 10, he tried to kiss her while they were in his hotel room.  When she rebuffed him, he "unleashed tons of hurtful texts."  *Id.* at 6.

Foster began to "fear[] for [her] safety."  *Id.*  She continued to see the harasser socially but reiterated that she didn't have romantic feelings for him.  After the February residency, the harasser sent a series of messages to Foster "ruminating" about his feelings.  *Id.* at 7.  The two did not interact during the March residency, but after it ended he sent her more text messages.  She texted back that he was "scaring" her.  *Id.*  Feeling "overwhelmed," Foster reached out to the University. *Id.*

After hearing Foster's account of what had happened, the University responded the next day.  It ordered the harasser not to contact Foster in any way or to retaliate against her.

The University then interviewed the harasser, who gave a different account of their relationship.  In his telling, when he expressed romantic feelings to Foster during the October 2013 residency, she was "amenable to elevating [their] relationship to the sexual plane," asked him to

be "patient" with her, and told him to keep their relationship a "secret." *Id.* at 9. During the November and December residencies, they would go on dates and engage in foreplay in their hotel rooms. They started having sex during the January residency, but she stopped the "sexual experiment" afterward. *Id.* at 11. During the February residency, he tried to distance himself from her, but she would always "draw [him] back in" with "provocative conversation." *Id.* He avoided her completely during the March residency because he was "intent upon NOT falling back" in love with her. *Id.* at 12. He denied engaging in sexual misconduct.

On March 29, the harasser violated the no-contact order by sending Foster a one-word text: "Really." R.48-13. Foster alerted the University, and it promised to reprimand the harasser the next day. And so it did. The harasser apologized, explained the text had been a misunderstanding, and vowed he would "not do it again." R.44-15. He did not text her again.

On March 31, the University told Foster about the safety measures it had imposed for the final residency session, scheduled from Thursday, April 3 to Saturday, April 5. It would house the harasser in another hotel. He would eat separately from the rest of the cohort and would leave the cafeteria prior to her arrival. In classes, the harasser would sit out of Foster's sight. The harasser knew that if he showed up to a social event and noticed Foster, he had to leave "immediately." R.44-16. The school also put Foster in touch with two administrators charged with monitoring the residency session and helping her as needed.

Foster sent a follow-up email expressing concern for her safety and wellbeing, explaining that she did not want to be "in the same room" as the harasser. R.44-19. The University offered additional accommodations. It assured her that she would not have to speak in front of the harasser and that her grades would not suffer. The University offered both Foster and the harasser the opportunity to complete their educations at the Ann Arbor campus instead. Each declined.

The University successfully implemented the safety measures during the Thursday session. At one point, a professor stopped the harasser from entering the dining hall while Foster ate inside. No contact as a result occurred between the harasser and Foster that day.

Upon the harasser's request, the same professor provided him with access to the hotel Wi-Fi, something he presumably lacked after the University moved him to a different hotel.

Believing he had been unfairly denied dinner, the harasser sent a crude email to the faculty, though not Foster, late that night. He insisted on attending a private karaoke event that he had already arranged for the following evening for the students in the program, no matter who attended. And he invited the University to "pound sand." R.44-22 at 1.

Overnight and into Friday morning, the University considered whether to remove the harasser from the Friday morning session in view of the late-night email, but decided against it. The University told Foster not to attend the private karaoke event that the harasser had organized.

The harasser violated the no-contact order on Friday. He "got right in [Foster's] way" during a break, stood in front of the coffee table to prevent her from getting coffee, and stood in the lunchroom until Foster had to enlist one of the administrators to get her lunch. R.44-2 at 21. He also posted an offensive comment about her on his Facebook page.

After Foster notified the University about the Facebook post, it called the harasser and told him that he could not attend class the next day, the last day of the program. The harasser emailed his classmates to explain his absence. He revealed that Foster had filed a complaint against him and described their purported affair in a crude way. He also bombarded staff and administrators with a series of strange, if not unhinged, emails. The University's general counsel replied, insisting that the harasser desist from further contact with the University's staff and Foster. He added that any further violation would put the harasser's "receipt of a degree in grave jeopardy." R.48-31.

In response to the harasser's emails, the University also prohibited him from attending the MBA commencement ceremony in Ann Arbor. To make sure that he would not attend, the University contacted his lawyer and secured the lawyer's assurances that her client would comply. It also reached out to the Ann Arbor campus police force and asked them to conduct a "threat assessment" based on the harasser's recent emails. R.48-33 at 2. The officers concluded that he did not pose a danger to the safety of Foster or others. The University took one more precaution. It assigned plainclothes officers to stay near Foster and to protect her at the commencement ceremony. Foster took a measure of her own. She obtained a temporary restraining order against the harasser from a California court.

Foster requested, and received, extensions from at least one professor to complete her assignments for the program. When she reported difficulty focusing, the University permitted her to retake an exam and did not count the first try against her.

On April 29, Foster told the University that she saw a Facebook post by the harasser suggesting he would travel to Ann Arbor to attend the commencement ceremony. The University told the campus police about the message. It provided a photo of the harasser to the staff at the Executive Residence, where the MBA commencement would be held. And it stationed a police officer in Foster's hotel.

Foster arrived at the Executive Residence on April 29. When she went into one of its common areas, she saw the harasser's reflection in a window. She found a campus police officer, who escorted the harasser out of the building. Early the next morning, campus police received a copy of the temporary restraining order. Later that day, they located the harasser at, perhaps unsurprisingly, a karaoke bar, and arrested him. They took him to the airport and forced him to board a plane back to California.

On May 1, the University released its investigative report. Based on the evidence and statements supplied by Foster, the harasser, and five witnesses, it determined that the harasser had committed sexual misconduct and imposed sanctions against him, mainly a permanent no-contact order. It placed a permanent notation on his transcript that he had committed sexual misconduct. It banned him from campus for three years. And it banned him from ever attending a University event that Foster attended.

Foster sued the University of Michigan under Title IX on the theory that it had shown deliberate indifference to her complaints of peer-on-peer harassment. The district court granted the University's motion for summary judgment. That decision prompted this appeal.

II.

"No person in the United States," Title IX says, "shall, on the basis of sex, be . . . subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The statute covers a school that "subject[s]" students to sex-based

"discrimination" in at least two ways.  A school might directly interfere with a student's participation in an education program on the basis of sex.  Or it might indirectly do the same thing by being "deliberately indifferent to known acts of student-on-student sexual harassment." *Davis*, 526 U.S. at 647.  This case concerns the second possibility.  The University accepts, for purposes of resolving this summary judgment motion, that Foster suffered actionable sexual harassment— harassment "so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." *Id.* at 633.  That leaves one question:  Was the University "deliberately indifferent" to Foster's plight? *Id.* at 647.

Deliberate indifference, as the phrase suggests, presents a "high bar" to imposing Title IX liability on a university. *Stiles ex rel. D.S. v. Grainger Cnty.*, 819 F.3d 834, 848 (6th Cir. 2016). It's not a university's job to do the impossible—to "purg[e] [its] school[] of actionable peer harassment"; it's a university's job to respond in good faith when allegations of harassment arise. *Davis*, 526 U.S. at 648.

A review of the facts in *Davis*—the key case in the area—adds contour to the deliberate-indifference standard.  When a fifth-grade boy waged a months-long campaign of sexual harassment against a girl who sat next to him in class, the school did almost nothing. *Id.* at 633–35.  The harassment included vulgar statements, such as "I want to get in bed with you" and "I want to feel your boobs," and physical elements, such as the harasser's "rubb[ing] his body against" the victim in a "sexually suggestive" way and "attempt[ing] to touch [the victim's] breasts and genital area." *Id.* at 633–34 (quotations omitted).  Most of the harassment occurred in the classroom and under a teacher's supervision. *Id.* at 633–35, 646.  The victim's grades suffered, and she contemplated suicide. *Id.* at 634, 652.  Despite her quick and frequent reporting, the school took "no disciplinary action" and failed to make "any effort" to separate the harasser from the victim. *Id.* at 635.  It did not even permit the victim to change desks until after three months of reported harassment. *Id.*  The victim established a cognizable claim of deliberate indifference, the Court concluded, because the school "fail[ed] to respond in any way over a period of five months to complaints of [the harasser's] in-school misconduct." *Id.* at 649.

Gauged by these standards, the University of Michigan did not show deliberate indifference.  Recall that the University did not know anything about the harassment until March

13, 2014, when Foster first complained about it. The University learned the details of the situation during a Title IX interview on March 20. At that point, the Executive MBA program had three more days of classes (April 3–5) and one commencement ceremony (April 30–May 1).

From the first notice of harassment on March 13 through commencement, Foster presented the University with five complaints of misconduct by the harasser. Each time, the University adopted escalating measures proportionate to the misconduct.

First, on March 13, 2014, Foster notified the University that she had suffered sexual harassment. The University promptly opened a Title IX investigation and put in place interim protective measures. It ordered the harasser not to contact Foster, banned him from her hotel, required him to eat meals separately from the group, instructed him to leave any social event she attended, and warned him against retaliating in any way. The University assigned two administrators to monitor his activity and assist Foster if any issues arose. That is not deliberate indifference.

Second, on March 29, the harasser violated the no-contact order through a single-word text: "Really." R.48-13. In response, the University issued a verbal warning. The harasser apologized, explained that he meant to send the text to someone else, and promised that he would not make the same mistake again. From that point on, he never texted Foster again. Before that, he had done so frequently; that indeed was a feature of Foster's March 13 complaint. The University made sure the problem did not undermine Foster's education or performance. It excused her from classroom participation, granted her extensions on assignments, and apprised her professors of the situation. It also offered her and the harasser the opportunity to finish the MBA program at the University's campus in Ann Arbor. Each declined. That is not deliberate indifference.

Third, during the last three-day session and after no problems emerged during the April 3 class, the harasser violated the no-contact order on April 4. He "got right in [Foster's] way" during a break, stopped her from getting coffee by standing in front of the table, stood in the lunchroom, and made an offensive comment about her on Facebook. R.44-2 at 21. In response, the University banned him from all future school events, including the April 5 class and the commencement ceremony.

The harasser did not respond well. He sent an inappropriate email to several of his classmates and several over-the-top, deranged emails to the University. In response, the University contacted his lawyer and secured the lawyer's assurances that her client would comply with the disciplinary sanctions. It then contacted campus police and asked them to conduct a "threat assessment" to determine what danger the harasser posed to Foster and others in the community. R.48-6 at 2. Even though the assessment concluded that the harasser did not pose a risk to anyone's physical safety, the University assigned several plainclothes officers to guard Foster during commencement. That is not deliberate indifference.

Fourth, when Foster noticed on Facebook that the harasser appeared to be planning to attend commencement anyway, the University addressed the problem. It shared Foster's tip with the Ann Arbor campus police and provided a photo of the harasser to the front desk of the hotel at which the commencement would be held and at which Foster would be staying. And it assigned a police officer to stay overnight in Foster's hotel for the duration of her visit. That is not deliberate indifference.

Fifth, the harasser for reasons all his own nonetheless went to the commencement ceremony. When Foster saw his reflection in a window at the hotel, she told the University. Campus police arrested him, escorted him to the airport, and sent him back to California. He never had a chance to interact with Foster. That is not deliberate indifference.

Whether examined incident by incident or in combination, the University did its level best to protect Foster from this harassing classmate. It started with precautionary measures, moved to a verbal warning, and imposed a series of increasingly severe sanctions that led to a suspension from the last class and commencement as well as a one-way flight back to California. That wasn't the end of it. The University banned the harasser from its Ann Arbor campus for three years, permanently banned him from any campus events that Foster planned to attend, and placed a notation on his transcript that he had engaged in sexual harassment. All the while, it took proactive measures to protect Foster's safety.

The University also attempted to ameliorate the effects of the harassment on Foster's education, what Title IX is "designed to protect." *Davis*, 526 U.S. at 652. When Foster expressed

concerns about participating in class, it excused her.  When Foster sought time extensions on her assignments, it granted them.  When Foster asked to retake a test, it permitted a second try.  When Foster explained the damage the harasser wrought on her networking prospects, the University banned him from future networking events.  These measures indeed went beyond what a university is required to do.  That is not deliberate indifference.

Compare these circumstances to a case with far less proactive conduct by the school and in which the school nonetheless prevailed.  *Stiles* involved a school administration that responded to a victim's allegations of continued peer-on-peer harassment, filed over the course of 18 months, with one verbal warning after another.  *See* 819 F.3d at 849.  Even so, because the school went beyond "merely talking to the offender[]" and took some proactive steps to protect the victim from further harassment, we concluded it could not be found liable for failing to "eliminate [his] peer harassment" altogether.  *Id.* at 850–51.  The same is true, far more true, here.

Now compare these circumstances to cases in which the schools lost.  In *Vance v. Spencer County Public School District*, harassers "touched [a middle school girl] inappropriately" in "virtually every class" for over a year.  231 F.3d 253, 257 (6th Cir. 2000).  Despite repeated complaints by the victim and her mother to school officials, they responded only with a string of verbal warnings.  "[T]he more [the victim and her mother] complained," the more the harassment "seemed to increase."  *Id.*  In that context, we found the school's pattern of non-responses deliberately indifferent.  *Id.* at 262–63.  Likewise, in *Patterson v. Hudson Area Schools*, the victim suffered years of "persistent harassment" that included "daily" bullying, physical assault, and sexual assault.  551 F.3d 438, 439, 442, 448 (6th Cir. 2009).  We found a cognizable claim of deliberate indifference because the school's "only response" to the victim and his mother's pleas for help was to "employ the same type of verbal reprimands" that had already come up short.  *Id.* at 449.  Reading the facts in these cases is all it takes to appreciate the significant difference between those cases and this one.

Foster suggests that, whenever harassment continues after a school receives notice, a reasonable jury can find that the school remained deliberately indifferent.  That can't be.  Foster's proposed rule calls to mind strict liability, not deliberate indifference.  The deliberate indifference standard makes schools liable when they "refuse[] to take action to bring the recipient into

compliance," *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998), not when they take action that ultimately fails to "purg[e] their schools of actionable peer harassment," *Davis*, 526 U.S. at 648. We ask not whether the school's efforts were ineffective but whether they amounted to "an official decision . . . not to remedy the violation." *Id.* at 642 (quotation omitted). To the extent *Patterson* suggests that an ineffective response necessarily generates a jury issue on deliberate indifference, *cf.* 551 F.3d at 448, that is wrong.

What at any rate could the University have done differently? That's not the test of course. Else, strict liability would be the rule, and we would be ignoring the Supreme Court's admonition that a Title IX plaintiff (or lower court) has no right to insist on "particular disciplinary action[s]." *Davis*, 526 U.S. at 648. But it's still worth asking the question because, if the claimant can't identify a better approach, it follows that no deliberate indifference occurred. Foster points to several roads not taken. None advances her case.

Start with her suggestion that the University could have suspended the harasser. But isn't that what it did in a series of escalating ways? At the outset, it banned him from staying at the hotel. Then, after he violated the no-contact order, it banned him from attending any remaining classes and from the commencement ceremony. That means he could not attend any official school events, which surely counts as a suspension, as any parent of a trouble-making student could attest.

If Foster means to say that the ban came too late, that too defines deliberate indifference down. And unfairly so. At the time the University issued its no-contact order, it had no reason to believe the harasser would refuse to abide by the order's terms. From that point on, after the "Really" text, it gave only one verbal warning before removing him from the classroom for good. Even then, it stopped at a verbal warning only after receiving an apology and assurances that the incident would not happen again. While we have cautioned schools against relying on verbal warnings that repeatedly do not work, *see, e.g.*, *Patterson*, 551 F.3d at 449; *Vance*, 231 F.3d at 257, we have never suggested that schools may not employ verbal warnings before turning to harsher sanctions.

The late-night karaoke email says more about the harasser than the school. True, the harasser's email suggested he might violate the no-contact order if Foster showed up at this

non-school-sponsored event.  But the University told Foster about the email and suggested she not attend the karaoke event.  And the harasser gave the University no reason to believe that he would violate the no-contact order in the classroom given that he had complied with the order in class the day before.  Absent more reason to be concerned about a problem in class the next day, the University did not act in an intentionally indifferent way by allowing the harasser to go to this second-to-last class of the MBA program.

The dissent maintains that one of the administrators "admi[tted] inadequacy" by suggesting that the satellite MBA program lacked resources for dismissing the harasser.  Dissent at 34 (quotation omitted).  Hardly.  The administrator simply noted that the school would have to work with hotel security rather than campus police.  And hotel security proved up to the task of keeping the harasser out of class.  If the University was short on anything, it wasn't resources; it was time.  And its real-time decision did not rise to the level of deliberate indifference.

What about Foster's call for an "immediate expulsion" of the harasser?  R.18 at 13.  That is a heavy lift in a case in which the claimant first told the University about the harassment two weeks before the last three-day session and in which it suspended the harasser when the initial steps did not work.

Recall that the harasser has "constitutional [and] statutory" rights too.  *Davis*, 526 U.S. at 649.  It's "entirely reasonable for a school to refrain from a form of disciplinary action that would expose it" to lawsuits by the harasser.  *Id.*  Alleged harassers have not been shy about suing school administrations under Title IX and § 1983 for denying them educational opportunities without the requisite notice and process.  *See, e.g.*, *Doe v. Oberlin Coll.*, 963 F.3d 580, 581 (6th Cir. 2020); *Doe v. Baum*, 903 F.3d 575, 580 (6th Cir. 2018); *Doe v. Purdue Univ.*, 928 F.3d 652, 670 (7th Cir. 2019).  Foster's harasser threatened to join this number, forcing the University to hold the thin line between immediately protecting Foster and denying the harasser process before expelling him.  In this light, the University's decision to take steps "short of expulsion" did not rise to the level of deliberate indifference.  *Davis*, 526 U.S. at 648.

Any other approach would encourage universities to expel first and ask questions later.  Because these cases often generate triable issues of fact, a pattern that will accelerate if we dilute

deliberate indifference into mere reasonableness, the day will eventually come in which two different juries will find that the same university loses coming and going over the same incident—by insufficiently protecting the rights of the victim in one case and by insufficiently protecting the rights of the accused in the other. Instead of identifying ways to avoid this parade of horribles, the dissent sponsors an additional float or two. Dissent at 38–39. Save for the highly unusual case, we respectfully disagree with the idea that Title IX was meant to impose liability on universities coming and going.

Foster insists that this dispute does not implicate any such due process concerns. In her view, the "Really" text and the karaoke email gave the University undisputed evidence that the harasser violated the no-contact order and planned to do it again. Not so. The harasser called the text an accident, apologized, and never sent another text to her. As for the karaoke email, it went to university staff, not Foster, and the University legitimately doubted that it violated the no-contact order or amounted to "retaliation." R.44-5 at 7.

One thing more on this score. Expulsion would not have prevented many of the harassing acts—the "Really" text, the Facebook post, and the trip to Ann Arbor on the weekend of the graduation ceremony—because they lay beyond the school's control. Immediate expulsion would not have secured Foster any quantum of protection that the suspensions did not.

That leaves the suggestion that the University should have secured a no-trespassing order against the harasser after banning him from commencement. But the harasser gave the University no reason to believe he would attend the ceremony. And the University did not act indifferently in taking an officer of the court—the harasser's lawyer—at her word when she assured the school that her client would not fly from Los Angeles to Ann Arbor for the event. A no-trespassing order would not have changed things anyway. Even without this order, the University took numerous steps to provide for Foster's safety, such as having campus police stay overnight in her hotel and positioning them near her at the event. These measures worked. When the harasser showed up, campus police arrested him and promptly placed him on a one-way flight back home. He never interacted with her.

Context, as in most things, tends to illuminate. Title IX deliberate indifference claims have special resonance when the school "exercises substantial control over both the harasser and the context in which the known harassment occurs," as in an elementary school. *Davis*, 526 U.S. at 645. But that plainly does not describe many features of this situation. Universities differ from grade schools when it comes to the control they have over students. That's all the more true for off-site graduate programs conducted at a hotel, over 2,000 miles from a campus, for mid-career executives with an average age of 40. Much of the misconduct in this case did not even occur in the classroom but in inappropriate comments on Facebook, over which the University has no control. Even when the harasser sent inappropriate emails to classmates, spilling the details of a self-described affair, the University could not restrain his ability to use external email addresses he already had. It could and did control the harasser's physical presence at classes, social events, ceremonies, and the like. And it could and did punish the harasser when he deployed these means of communication in hurtful ways. All of this does not mean Title IX fails to protect forty-year-old "free adults" learning in an off-site graduate school; it just means the deliberate-indifference inquiry operates differently than it does for elementary-age "schoolchildren" over whom grade schools possess a unique degree of "supervision and control." *Id.* at 646 (quotation omitted).

Contrary suggestions exceed the grasp of a deliberate-indifference claim. Sure, administrators discussed terminating the harasser's school email account. But there's no suggestion in the complaint or in the record that this would have protected Foster in any meaningful way. All but one of the abusive emails went directly to the University. And it had no choice but to continue dialogue with the harasser. It had a Title IX investigation to conduct. True enough, the University also provided the harasser with Wi-Fi for the final residency session. But that event predated the conduct that led to his removal from class. And attending business school without internet access makes little sense anyway. This argument ultimately devolves into a variation on the theme that the University should have expelled him immediately.

Under Title IX, a school may be held liable only for what it can control. The University of Michigan did not show deliberate indifference when it comes to that duty and the limits on that duty. In *Davis*, the Court said that, "[i]n an appropriate case, there is no reason why courts, on a

motion to dismiss, for summary judgment, or for a directed verdict, could not identify a response as not [deliberately indifferent] as a matter of law." 526 U.S. at 649. This is one of those cases.

We affirm.

---

**DISSENT**

---

KAREN NELSON MOORE, Circuit Judge, dissenting. Title IX's deliberate indifference standard for institutional liability in cases of student-on-student sexual harassment asks whether the school's response to sexual harassment was "clearly unreasonable in light of the known circumstances." *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 648 (1999). This standard does not require a particular response of school administrators, *id.*, leaving an array of options to choose from. Think of those options as falling along a spectrum that begins with doing nothing at all and ends with immediate expulsion of the harasser. The one extreme—doing nothing in response to known sexual harassment—would be clearly unreasonable no matter the circumstances, a straightforward case of deliberate indifference. The other extreme—immediate expulsion—would almost certainly be *not* clearly unreasonable as a matter of law; this response is the antithesis of deliberate indifference (even though it would raise serious issues of procedural due process for the accused harasser).

But what about the wide range of possible responses that fall somewhere in between those two poles? Certainly, some of those responses will be so clearly reasonable in light of the known circumstances as to entitle a school defending against a Title IX damages action to judgment as a matter of law. Just as certainly, however, there will be responses where reasonable jurors could differ as to whether the school's response to sexual harassment was deliberately indifferent. In many, if not most cases, determining whether the school's response amounts to deliberate indifference requires a fact-intensive inquiry into the nature of the response and the circumstances surrounding it. This case asks us to decide whether one such response—the University of Michigan's ineffective response to a fellow student's sexual harassment of Rebecca Foster[1]—was so clearly reasonable as to entitle the University to summary judgment. Because Foster has established genuine issues of material fact as to the University's deliberate indifference, I dissent.

---

[1]Henceforth, this opinion will refer to this student as the "respondent." At this stage, the University does not contest that the respondent sexually harassed Foster.

## I.  BACKGROUND

Foster and the respondent were both part of an off-site executive MBA ("EMBA") program based in Los Angeles through the University of Michigan Ross School of Business.  As part of the program, the students occasionally took part in "residencies," which were once-a-month, weekend educational sessions at the Beverly Wilshire hotel in Beverly Hills.  R. 48-2 (Foster Dep. at 90–91) (Page ID #951).  The students would check in to the hotel on Thursday night, take part in all-day sessions on Friday and Saturday, and check out on Saturday night.  *Id.*

### A.  Pre-Report Background

Foster developed a friendship with the respondent in the fall of 2012 through the spring of 2013.  R. 48-10 (Office for Institutional Equity ("OIE") Investig. Rep. at 1) (Page ID #996).  She did not have a dating or sexual relationship with the respondent.  *Id.*  The respondent began sending complimentary texts to Foster in May 2013, *id.* at 2, and began expressing a "more intense and romantic interest in her" in September 2013, *id.* at 3.  At this time, he began giving her unsolicited gifts, informing her that she "h[e]ld beguiling power over [him]," and suggesting he wished to date or marry her.  *Id.*  On multiple occasions, the respondent made unwanted physical contact with Foster, as follows:

- During the December 2013 residency, the respondent "grabbed [Foster's] butt as she was walking away from an elevator."  *Id.* at 4.

- While they attended a football game over the winter holiday (the Phoenix bowl game), the respondent "rubbed her leg/put a hand on her knee."  *Id.*

- On New Year's Eve 2013, while Foster, the respondent, and two classmates visited the Griffith Park Observatory, the respondent "grabbed her and kissed her forcefully on the cheek."  *Id.* at 4–5.

- On January 8, 2014, during the EMBA program's monthly residency, the respondent brought coffee to Foster's hotel room, and Foster told him to leave her alone and get out, but instead he climbed into bed with her and attempted to force himself on her.  *Id.* at 5; R. 48-2 (Foster Dep. at 117) (Page ID #955).  Foster then got out of bed, went into the bathroom, closed the door, and undressed to shower.  R. 48-10 (OIE Investig. Rep. at 5) (Page ID #1000).  The respondent then opened the door, entered the bathroom while Foster was naked, and pulled his pants down.  *Id.*  Foster demanded he leave her room, and he left.  *Id.*

- On February 7, 2014, during another residency, the respondent again brought coffee to Foster's hotel room, and after Foster answered the door, she returned to bed and told the respondent to leave multiple times. *Id.* at 6. The respondent then climbed into bed and tried to—in his words— "schnuggle" with her from atop the covers. *Id.*[2]

In addition to this unwanted physical contact, between September 2013 and February 2014, the respondent repeatedly expressed romantic feelings for Foster, despite her clearly rejecting his advances and informing him that she wanted a platonic friendship. *Id.* at 3–6. On February 28, 2014, after receiving a series of messages from the respondent regarding his perception of their failed relationship, Foster called the respondent, told him that he should seek professional help, and "asked him not to talk to her about his romantic interest in her anymore." *Id.* at 7. After the respondent sent Foster several text messages on March 9 and 10, to which she did not respond, the respondent sent her a message on March 11, stating, "Do I creep you out?;)" *Id.* Foster responded: "No. You're scaring me and I want this to stop." *Id.* The two exchanged several messages thereafter, with Foster accusing him of "trivializing the way" she felt. *Id.*

**B. The March Report and Pre-April Residency Response**

On March 13, 2014, Foster first reported that the respondent had sexually harassed her to the University's Office of Institutional Equity ("OIE")[3] and the Ross School. R. 44-7 (Heatlie 3/13/14 email) (Page ID #772). Over the next few days, OIE and Title IX Coordinators from the University were in touch with Foster to interview her and collect documentation corroborating her report. On March 18, 2014, Foster provided OIE with over 300 screenshots of over 900 text messages the respondent had sent to her and evidence of gifts and letters she had received from him. She also raised concerns about an online school session taking place the next day;

---

[2]Foster initiated physical contact with the respondent on one occasion: On January 6, 2014, when she was "tired and worn down," she kissed him and the kiss lasted for approximately ten seconds; she made an excuse to end the kiss. R. 48-10 (OIE Investig. Rep. at 5) (Page ID #1000).

[3]The OIE is responsible for investigating sexual misconduct allegations at the University, including those involving students and employees. *See generally* The University of Michigan Interim Policy on Sexual and Gender-Based Misconduct (Aug. 14, 2020), available at: https://sexualmisconduct.umich.edu/wp-content/uploads/2020/08/policy-on-sexual-gender-based-misconduct-08-07-20.pdf. Its coverage extends to University "Program[s] or Activit[ies]," and thus its coverage extends beyond the Ross School to an array of programs such as, for example, the University's Law School, study abroad programs, field work, etc. *See id.*

specifically, she did not want the respondent to know that she was attending the session. R. 44-7 (Foster 3/18/14 email) (Page ID #770). OIE Investigator Rebecca Veidlinger informed Foster the next day that she had made arrangements with the session's professor to ensure that Foster's concerns would be addressed. R. 44-8 (Veidlinger 3/19/14 email) (Page ID #774). The online class took place without incident.

On March 21, 2014, Veidlinger contacted the respondent to schedule a meeting to discuss Foster's allegations. R. 44-12 (Veidlinger 3/21/14 email #1) (Page ID #780). In a subsequent email to the respondent that day, Veidlinger finalized plans for this meeting and stated:

> In the meantime, you are instructed to have no contact with Rebecca Foster. This includes direct and indirect contact, and includes contact in person, by email, by text message, by phone, or through a third party. In addition, as you read in the Student Sexual Misconduct Policy, the University prohibits retaliation of any kind so you are instructed not to retaliate in any way.[4]

*Id.* at 779. While it began to investigate Foster's complaint, the University developed a set of interim accommodations in response to her concerns. On March 28, administrators discussed one accommodation internally: where the respondent would stay and eat during the upcoming April residency. *See* R. 48-12 (OIE-Ross emails) (Page ID #1023–25).

On Saturday, March 29 at 11:45 p.m., the respondent sent a text message to Foster that stated, "Really". R. 48-13 (Text Message) (Page ID #1026). That same night, Foster notified Veidlinger of the message, stating that it was "very distressing" and asking, "Should I make further arrangements for my safety at this point?" R. 48-14 (Foster 3/30/14 email) (Page ID #1027). The next morning, Sunday, March 30, Veidlinger responded: "I will address this text with [the respondent] tomorrow. As to your safety, you are the best judge of your immediate needs. Please keep me informed if he makes any other contact." *Id.*

On Monday, March 31, Claire Hogikyan, Managing Director for the EMBA program, sent Foster and the respondent separate emails enumerating a list of accommodations for the April

---

[4]This instruction is hereinafter referred to as the "no-contact order."

residency, which would begin in a few days.  The email to the respondent included the following details:

- The respondent would stay at a different hotel from the one where the residency would be held and where Foster would be staying.

- The respondent would be "required to put [his] food on a plate or in a to-go container and eat in a separate location outside of the Le Petit Trainon [sic] dining room."

- The respondent was prohibited from "attending any social activities outside of the scheduled classes where Rebecca Foster is in attendance."

- The respondent was prohibited from interacting with Foster "in any way during class."

R. 48-17 (Hogikyan 3/31/14 email) (Page ID #786).  Hogikyan also stated that she would be present during the residency "to ensure compliance with these measures."  *Id.*  The email to Foster was similar in substance, with fewer details.  Hogikyan added in the email to Foster that Nirav Mehta, a University professor, would be present during class and would "make sure that [the respondent] is seated appropriately out of your sight."  R. 48-15 (Hogikyan 3/31/14 email) (Page ID #1029).

Foster was unsatisfied with these accommodations.  In correspondence with Veidlinger that day, Foster stated that the accommodations "do not address my safety" and that she did not want to be in the same room as the respondent during the upcoming residency.  R. 48-17 (Foster 3/31/14 email) (Page ID #1032).  She reiterated that the respondent had violated the no-contact order with his March 29 text message.  Foster also inquired (1) how she was expected to handle class participation, including speaking in class; (2) how to manage breaks during class sessions, given that, for example, she would have to cross the respondent's path every time she wished to use the bathroom; (3) how the University would address her desire not to see him and for him not to see her, including at social functions; and (4) whether the respondent was able to discuss with others the investigation and why his accommodations had changed for the April residency.  *Id.*

Approximately twenty-four hours later, on Tuesday, April 1, Veidlinger responded to each of the points raised in Foster's email as follows:

1.      She assured Foster that she would not be called upon to speak in front of the respondent and that non-participation in the residency would not affect her grade.

2.      She noted that "it is possible, given the concentrated nature of the residency classes, that the Respondent and you might have some incidental contact at break time." Veidlinger suggested that "contact can be avoided if you use the bathroom in your room."

3.      She reiterated that the no-contact order required the respondent to leave a social function if Foster were present. She suggested that, in light of Foster's discomfort, "you may choose not to attend a social function if you know he is already there."

4.      She explained that both parties were permitted to discuss the investigation.

R. 48-18 (Veidlinger 4/1/14 email) (Page ID #1033). Veidlinger also indicated that she had spoken with the respondent the day before (March 31) about his apparent violation of the no-contact order through the text message he had sent to Foster: "He said it was intended to go to someone else, that he mistakenly texted you, and that he was sorry to have done that. We went over the no contact and retaliation provisions and I do not expect anything like that to happen again." *Id.* In a phone conversation with Hogikyan that same day, Foster requested in-classroom security, which Hogikyan denied. R. 48-2 (Foster Dep. at 166, 185) (Page ID #958, 961). According to Foster, Hogikyan explained that she didn't want to "escalate the situation," perhaps because prospective students would be attending the residency that weekend and the University "did not want it to look like they needed security in [the] classroom." *Id.* at 166–68 (Page ID #958). Also, on April 1, the University conveyed an offer to both Foster and the respondent to attend the upcoming residency in Ann Arbor instead of Los Angeles; both parties declined. R. 48-3 (Hogikyan Dep. at 45–46, 65, 69) (Page ID #974–76).

**C.  The April Residency**

The April 2014 residency began on the evening of Thursday, April 3, and the students had a class session from 5:00 to 7:30 p.m.  R. 48-3 (Hogikyan Dep. at 39) (Page ID #972).  After class ended, Foster and the respondent were among the last remaining students in the classroom.  R. 44-21 (Mehta 4/10/14 email) (Page ID #793).  Foster then entered the dining room.  Mehta, who had been monitoring Foster and the respondent in the classroom as planned, approached the respondent and explained that because Foster was already in the dining room, it would be impossible for the respondent to go through the line and exit the room before Foster entered.  Mehta offered the respondent several alternative options for getting food from the dining room.  The respondent objected to what he perceived as preferential treatment toward Foster and stated that if he did not receive an apology from the EMBA program, he would have a "response" and things would get "ugly."  *Id.*  The respondent did not enter the dining room and had no contact with Foster.  *Id.*

Late that night, the respondent sent a crude email to various University administrators.  He referred to the Title IX investigation as a "retarded witchhunt" and a "specious witch hunt," and referred to Foster as "your psycho hobeast client" and a "lying slut whore."  R. 48-20 (Respondent 4/4/14 email) (Page ID #1036).  He also stated,

> [I]f you think for a minute that i am either going to miss [an upcoming social activity] or abruptly depart it just cause some lying slut whore seeks baseless vindictive retribution, well youve got an inflated sense of your own influence and with that, another thing comin.  i'd recommend you protect your shrinking violet client by informing her that i will in fact be there, and if she (or you) have a problem with that, you're welcome to pound sand.

*Id.*

Upon receiving the respondent's email on Friday morning, April 4, University administrators considered whether to remove him from class that day.  R. 48-3 (Hogikyan Dep. at 77–84) (Page ID #978–79).  According to Foster, in a subsequent conversation with Hogikyan, Foster learned that on Friday morning, Veidlinger and Anthony Walesby, a University Title IX investigator, had told Hogikyan to remove the respondent from the property, but Hogikyan kept him in the classroom because she believed there was no imminent danger and she "thought

removing him would escalate the situation." R. 48-24 (Foster Notes) (Page ID #1045).[5] According to Foster, Hogikyan told OIE, University Dean Alison Davis-Blake, and Valerie Suslow, Senior Associate Dean of the Ross School, that "the school doesn't have the necessary resources to handle the situation (dismissal/removal of student) in place here in LA," and Davis-Blake and Suslow agreed. *Id.* Foster further recalls Hogikyan referring to "[s]omeone at Michigan" who had stated that, rather than attending the upcoming social activity with her classmates, Foster should "have her friends stay in with [her] and rent [a] movie." *Id.* Davis-Blake reportedly told the Ross School to "just get through [Friday] and then let due process kick in." *Id.*

Foster claims that during classroom breaks on Friday, April 4, the respondent violated the interim accommodations in numerous ways. First, he stood in her way of exiting the classroom; second, he stood in front of the beverage table for the duration of a break, preventing Foster from getting coffee; and third, while Foster was away from her desk, the respondent stood near or sat on her desk while speaking to the professor, preventing her from returning to the desk. R. 48-2 (Foster Dep. at 170–73) (Page ID #959–60). Later in the day, the respondent was in the lunchroom,

---

[5]The parties dispute the veracity of the statements in Foster's contemporaneous, personal notes, *see* R. 48-2 (Foster Dep. at 186–90) (Page ID #961–62), and whether the notes are admissible evidence. First, several University employees have testified that they did not discuss the topics that Foster says in her notes they did. For example, Walesby and University Dean Alison Davis-Blake testified that they did not recall any conversation regarding the school lacking the resources to handle the dismissal or removal of the respondent. *See* R. 48-4 (Davis-Blake Dep. at 17–19) (Page ID #985); R. 48-5 (Walesby Dep. at 43–44) (Page ID #987). *But see* R. 44-4 (Veidlinger Dep. at 34–35) (Page ID #734) ("I have a general memory of discussing . . . if this was going on on the Ann Arbor campus that we would have more resources available to us quicker, that they're not there."). At the summary-judgment stage, however, we construe all facts in the light most favorable to the non-moving party, *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), so we assume that Foster's sworn recollections of the facts are true.

More significantly, the parties dispute whether Foster's personal notes are admissible evidence and/or whether they contain admissible evidence. On the one hand, the University is correct that this record—an out-of-court statement by Foster—constitutes hearsay. For example, the record reads: "Claire told OIE and Allison/Valerie the school doesn't have the necessary resources to handle the situation (dismissal/removal of student) in place here in LA." R. 48-24 (Page ID #1045). Foster wishes to demonstrate that Hogikyan indeed made this statement—or in evidentiary terms, that this out-of-court statement is true. Although Foster is correct that opposing party statements are admissible, *see* Fed. R. Evid. 801(d)(2), the record itself is hearsay. However, the Supreme Court has cautioned that the party opposing summary judgment need not "produce evidence in a form that would be admissible at trial in order to avoid summary judgment." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Instead, a party opposing summary judgment who proffers evidence in a form not admissible at trial "must show that she *can* make good on the promise of the pleadings by laying out enough evidence that *will be* admissible at trial to demonstrate that a genuine issue on a material fact exists, and that a trial is necessary." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009). Here, the statements in the record would be admissible at trial. As a trial witness, Foster could lay a foundation for them and they could be admitted for their truth as opposing party statements. It is therefore proper for us to consider at this juncture any opposing party statements that are contained in R. 48-24.

which prevented Foster from getting her lunch. *Id.* at 173. Mehta asked Foster if she needed help with getting lunch, and Foster responded, "What is happening here? None of the interim measures are being held on your end." *Id.* Foster testified that she had to be very "discreet" in this conversation because she was sitting next to two students, and they were wondering why she could not enter the lunchroom. *Id.* Foster also recalls that during a break on Friday morning, Hogikyan conveyed to her that the school advised her not to attend a karaoke gathering that evening, because the respondent would be there. *Id.* at 159–60 (Page ID #957).

That evening, the respondent attended the karaoke event he referenced in his late Thursday/early Friday email. Foster did not attend. Late in the evening, however, she notified Hogikyan that the respondent had "posted to [her] Facebook wall," calling her a "[s]crub" and making a threatening comment about her boyfriend. R. 48-22 (Foster 4/4/14 email) (Page ID #1040). Foster then visited Hogikyan in her hotel room at the Beverly Wilshire. R. 48-23 (Hogikyan 4/5/14 email) (Page ID #1044). Hogikyan told Foster about the contents of the respondent's email from the night before and shared other emails from the respondent to the University. R. 48-24 (Foster Notes) (Page ID #1045). Foster told Hogikyan that she had been shaking for the last twenty-four hours and that Hogikyan was putting the entire class at risk. *Id.* In an email later that night to Suslow, Hogikyan confirmed that Foster had shared with her some of the text messages that the respondent had sent to Foster in the preceding months, as well as evidence that the respondent had "just posted a comment on [Foster's] Facebook wall" that night.[6] R. 48-23 (Hogikyan 4/5/14 email) (Page ID #1044). Hogikyan stated that Foster asked her to call security and "disallow [the respondent] into class" the next morning, and remarked, "I am inclined to agree given this new information." *Id.*

On Saturday morning, April 5, Hogikyan called the Hyatt Regency hotel, where the respondent was staying, and asked security to go to the respondent's room and inform him that he

---

[6]It appears that Foster and Hogikyan technically mischaracterized what the respondent had done on Facebook. Whereas Foster and Hogikyan contemporaneously referred to the respondent's action as posting a comment or post on Foster's Facebook wall, on appeal the parties agree that the respondent in fact "tagged" Foster on Facebook. Appellant Br. at 8; Appellee Br. at 15. Review of the relevant documents in the record—R. 48-22 (Page ID #1042–43) and R. 45-1 (Page ID #803–04)—supports the parties' characterization of the respondent's action, which is immaterial here.

was not to report to the Beverly Wilshire for class that day.  R. 48-3 (Hogikyan Dep. at 112) (Page ID #980).  Shortly thereafter, the respondent spoke with Hogikyan, who "informed him that he had violated the no-contact order, and, therefore, he was disallowed from attending class, and he should not come to the Beverly Wilshire that day." *Id.*

The respondent did not attend class.  He did, however, write an email to several classmates with the subject line "Explaining my regrrtable [sic] absence today," in which he provided background on the investigation and stated that because he had violated the no-contact order, he was barred from attending class that day.  R. 48-25 (Respondent 4/5/14 email) (Page ID #1047).  The email includes the following statements:  "i engaged in an inappropriate sexual relationship with our classmate rebecca foster"; "her claim . . . is false baseless and vindictive"; "Shes a mean awful person and wackadoo chick"; "my what a time we had in her bed and mine for a few months there.  I have no malice for her and shall be ever grateful for her sharing those world class tatas with me for awhile there." *Id.*

## D.  Post-April Residency

After the April residency ended, the respondent sent several emails to University administrators and professors involved in his Title IX investigation.  *See* R. 48-26 (Respondent 4/7/14 email) (Page ID #1049–50); R. 48-28 (Respondent 4/8/14 email #1) (Page ID #1054–58); R. 48-28 (Respondent 4/8/14 email #2) (Page ID #1053–54); R. 48-27 (Respondent 4/8/14 email #3) (Page ID #1051–52); R. 48-29 (Respondent 4/9/14 email) (Page ID #1059).  The emails generally criticized the University's handling of the Title IX investigation, used aggressive language, and demanded various things from the University.  The emails included the following statements:

- "You gettin this, MP?  Cause I know you well enough to know that you're probably pretty pissed at the egregious mishandling of this case by your minions . . . . If I were you, I'd pick up the damn phone, stat."  R. 48-27 (Page ID #1051).

- "I will graduate, with my class, in person and on time.  Ms. Rebecca Foster will be barred from the premises and from all programs thereto pertaining.  Or things could actually start to become slightly acrimonious, litigious, and epically embarrassing for all concerned parties." *Id.* (Page ID #1052).

- "Maybe this sordid episode will somehow make all of us better people. Want me to start writing up a case study? Wink." R. 48-28 (Page ID #1058).

- "Recommendation? Best deal with this matter sooner than later. Cause the story is growing deeply institutionally incriminating and embarrassing. And if left untended, could go hilariously viral. . . . Tick tock tick tock." R. 48-29 (Page ID #1059).

On April 10, Tim Lynch, General Counsel for the University of Michigan, wrote to the respondent and stated, in relevant part:

> The language and tone of your emails is wildly inappropriate and offensive. You are harassing others and embarrassing yourself.

> You will not be permitted to participate in any commencement activities.

> In addition, *any* further harassment by you of University faculty, staff, or students— by email or otherwise—will put your receipt of a degree in grave jeopardy.

R. 48-31 (Lynch 4/10/14 email) (Page ID #1062) (original emphasis). The same day, Hogikyan informed Foster that the University had informed the respondent that he was barred from commencement. She added: "I don't know how close you live to him. Please exercise caution." R. 48-32 (Hogikyan 4/10/14 email) (Page ID #1064). Foster replied the following day, seeking information as to why she should exercise caution. *Id.* (Foster 4/11/14 email) (Page ID #1064). Hogikyan replied that the respondent "has demonstrated erratic behavior" and that, because of this, she "wanted to err on the side of safety." *Id.* (Hogikyan 4/11/14 email) (Page ID #1064). Hogikyan then informed the University Dean that she had communicated this information to Foster, adding, "I am concerned for her as I understand that she lives near [the respondent]." R. 48-33 (Hogikyan 4/10/14 email) (Page ID #1065). The University took steps to remove the respondent from an unidentified LinkedIn group, *id.*, and based on the content of his emails, decided to have a threat assessment conducted of him. R. 48-3 (Hogikyan Dep. at 123–24) (Page ID #981). This assessment would help determine "what our risk of him actually showing up here [for commencement] is and the degree to which we need to be concerned." R. 48-34 (Cotrone 4/11/14 email) (Page ID #1069). The University Police concluded, based on their assessment, that the respondent "was not considered a physical threat to anyone on campus." R. 48-3 (Hogikyan Dep. at 124) (Page ID #981). The University planned to have a plainclothes University of

Michigan Police Department officer stationed at the Executive Residence, the official residence for the program, where Foster would be staying during commencement activities. R. 45-7 (Commencement Detail emails) (Page ID #811–12). On April 16, 2014, the respondent's attorney confirmed that the respondent would not attend commencement activities in Ann Arbor. R. 45-6 (Lowenstein 4/16/14 email) (Page ID #810).

On April 17, Foster obtained a restraining order against the respondent in Los Angeles. *See* R. 48-2 (Foster Dep. at 240) (Page ID #966).

On April 29, Foster informed Hogikyan that she had learned that the respondent would be traveling to Ann Arbor for commencement through a Facebook post and a conversation with two other students. R. 45-9 (Foster 4/29 emails) (Page ID #815). Foster also informed Hogikyan that she had a restraining order in place, but that she believed it pertained only to Los Angeles County. R. 45-11 (Hogikyan 4/29/14 email) (Page ID #819). Hogikyan testified that until it became clear that the respondent would be traveling to Ann Arbor, "[w]e were, up until that time, operating under the hope—if you will—that he . . . would follow his attorney's advice, or direction, and not come." R. 48-3 (Hogikyan Dep. at 159) (Page ID #982). Once Foster informed the University of the respondent's Facebook post announcing his intention to attend commencement, administrators had an "emergency get together," in which they "put . . . into action" the preparatory plan that they had devised in case the respondent arrived in Ann Arbor. *Id.* at 157, 160.

On the night of April 29, 2014, Foster was in a common-lounge area of the Executive Residence for a "graduation gathering," R. 48-41 (Police Rep. at 4) (Page ID #1101), when she saw the respondent through "a reflection in the glass" in the "same room" as her. R. 48-2 (Foster Dep. at 238–39) (Page ID #966). He stood up and looked at her. *Id.* She then went downstairs to the lobby of the hotel, where she was put in touch with Sergeant Hicks, the plainclothes officer stationed at the Executive Residence in case the respondent appeared. *Id.* Hicks and another officer told the respondent to leave the Executive Residence. *Id.* at 244 (Page ID #967). The next day, Foster provided the University with a copy of the temporary restraining order, and after it was determined that the order extended to Michigan, law-enforcement officers arrested the respondent. *Id.* at 241; R. 46-2 (Veidlinger 4/30/14 email) (Page ID #829). He was released into the custody

of the University police department and transported to the airport to board a flight back to California.  R. 48-41 (University Police Report at 6–7) (Page ID #1103–04).

On March 10, 2017, Foster brought this action under Title IX and amended her complaint on June 14, 2017.  On November 7, 2017, the district court denied the University's motion to dismiss the amended complaint.  On February 21, 2019, the district court granted the University's motion for summary judgment.  The court explained that as a result of the University responding "promptly, compassionately, and effectively" to Foster's complaints, the respondent's text messages to Foster, his Facebook posts mentioning her, and his physical interaction with her "all but stopped."  *Foster v. Univ. of Michigan*, No. 17-CV-10781, 2019 WL 764256, at \*13, 15 (E.D. Mich. Feb. 21, 2019).  Under these circumstances, the court held, "it would be simply impossible" for a reasonable jury to find that the University was deliberately indifferent under Title IX.

Foster timely appealed.

## II.  STANDARD OF REVIEW

Courts ordinarily begin their analysis with a recitation of the standards that govern their review of the issues presented.  The practice may not lead to the flashiest opinions—the practice may even seem a bit dull—but it serves at least a few important functions.  First, it orients the reader.  By delineating the scope of review and its limits, and the principles that structure the analysis, courts apprise the reader of the legal parameters of their decisions.  Second, it reminds the writer of their role.  Without a recitation of the rules, it is easier for the court to drift away from its carefully calibrated role in the legal process.  None of this is to say that there is some hard and fast rule that every opinion must include a rote soliloquy of standards.  But the majority might have benefitted from something like it here before it stepped out of its boots and into the jury's shoes.

Because we review de novo the district court's grant of summary judgment in favor of the University, we are bound by the same standards that governed the district court below.  *Garretson v. City of Madison Heights*, 407 F.3d 789, 795 (6th Cir. 2005).  Summary judgment is appropriate only where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  As explained by the

Supreme Court: "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Thus, summary judgment is appropriate only where the evidence "is so one-sided that one party must prevail as a matter of law." *Id.* at 252.

The law of summary judgment provides various interrelated safeguards intended to ensure that courts do not impose upon the realm of the jury. To begin with, "we draw all reasonable inferences in favor of the non-moving party and construe all evidence in the light most favorable to the non-moving party." *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 529 (6th Cir. 2012) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Similarly, "[c]redibility judgments and weighing of the evidence are prohibited during the consideration of a motion for summary judgment[.]" *Ahlers v. Schebil*, 188 F.3d 365, 369 (6th Cir. 1999) (citing *Anderson*, 477 U.S. at 255). Moreover, "[i]f reasonable minds could differ as to the import of the evidence," then summary judgment is unwarranted. *Anderson*, 477 U.S. at 250. Applying these guardrails, we ask whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. If so, there is a genuine dispute of material fact such that summary judgment is unwarranted and the case is for the jury, not the court.

## III. DISCUSSION

Title IX affords victims of student-on-student sexual harassment a private right of action for damages against schools that receive federal funding. *Davis*, 526 U.S. at 633. To prevail, the victim must establish that the school was "deliberately indifferent to sexual harassment, of which [it had] actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Id.* at 650. At this juncture, there is no dispute that Foster endured sufficiently severe, pervasive, and objectively offensive sexual harassment, nor that the University had actual knowledge of it. The question is whether the evidence before the district court was so one-sided that no reasonable jury could find that the University's response to that harassment was "deliberately indifferent."

But what, exactly, constitutes deliberate indifference?  The Supreme Court supplies the answer:  a school's response to sexual harassment is deliberately indifferent if it is "clearly unreasonable in light of the known circumstances."[7]  *Davis*, 526 U.S. at 648.  The response "must, at a minimum, 'cause [students] to undergo' harassment or 'make them liable or vulnerable' to it." *Id.* at 645 (quoting Random House Dictionary of the English Language 1415 (1966); Webster's Third New International Dictionary 2275 (1961)).  The deliberate indifference standard does not provide that schools can "avoid liability only by purging their schools of actionable peer harassment."  *Id.* at 648.  Nor does the deliberate indifference standard mandate "particular disciplinary action" in response to sexual harassment.  *Id.*  But neither does it require courts to conclude that minimal, ineffective, or belated efforts to respond to sexual harassment are not clearly unreasonable as a matter of law.[8]  *See, e.g.*, *id.* at 653–54; *Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253, 262 (6th Cir. 2000); *Patterson v. Hudson Area Schs.*, 551 F.3d 438, 450 (6th Cir. 2009); *Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1295–97 (11th Cir. 2007).

With these principles in mind, let us turn to Foster's claims.  Notably, Foster does not contend that the University responded with deliberate indifference when she reported the respondent's pre-March 13 sexual harassment of her.  Rather, Foster frames the issue as "whether the University's subsequent actions were adequate and effective once the school was aware that

---

[7]The majority appears to conflate deliberate indifference with a "good faith" standard. Maj. Op. at 7. Indeed, despite the fact that the Supreme Court has expressly defined deliberate indifference in this context to mean a response to sexual harassment that is "clearly unreasonable in light of the known circumstances," *Davis*, 526 at 648, that phrase (or even just "clearly unreasonable") is nowhere to be found in the majority's opinion. Conversely, the phrase "good faith" does not appear once in *Davis*. The school's "good faith" is beside the point—it does not prevent a jury from concluding that a school's response to sexual harassment was "clearly unreasonable in light of the known circumstances," and thus deliberately indifferent. *See id.*

[8]Contrary to the majority's insistence, *Davis*—a case where the school "fail[ed] to respond in any way over a period of five months to complaints of [the harasser's] in-school misconduct," *id.* at 649—does little to "add[] contour to the deliberate-indifference standard," Maj. Op. at 7. Yes, a school's abject failure to respond to known sexual harassment is an obvious example of deliberate indifference. But *Davis* does not stand for the proposition that *any* response to sexual harassment—no matter how lacking—is enough to clear the deliberate indifference bar; if it was, there would be no need to ask whether a response was "clearly unreasonable." *See Davis*, 526 U.S. at 648. A case involving *no* response to sexual harassment does nothing to explain the range of actual responses that a jury could reasonably find clearly unreasonable, let alone the range of responses that would be not clearly unreasonable as a matter of law. To employ *Davis* as the barometer for deliberate indifference, as the majority does, is to fundamentally misunderstand the nature of that inquiry.

the Harasser was not complying with the No Contact Order." Appellant Br. at 14. This is significant because it goes to the known circumstances that inform whether the University's response to the respondent's sexual harassment of Foster was clearly unreasonable. In other words, we are faced with a case where the University knew its initial response was ineffective and we must determine whether its subsequent actions were so reasonable—in light of that knowledge and the surrounding circumstances—as to warrant judgment in its favor as a matter of law. They were not, and the majority errs in concluding otherwise.

Foster reported the respondent's sexual harassment of her to the University on March 13, 2014. R. 44-7 (Heatlie 3/13/14 email) (Page ID #772). Then, on March 21, 2014, the University implemented its no-contact order, which instructed the respondent to have no contact with Foster—directly or indirectly—including "in person, by email, by text message, by phone, or through a third party." R. 44-12 (Veidlinger 3/21/14 email #1) (Page ID #780). The no-contact order also instructed the respondent that University policy forbade any form of retaliation against Foster and that he was not to retaliate against her in any way. *Id.* From that point on, Foster details an escalating campaign of harassment by the respondent and an accompanying series of ineffective, belated, or nonexistent responses by the University. She contends that, in light of the circumstances, a reasonable juror could find these responses were clearly unreasonable.

*The Respondent Dismisses the University's Initial Response.* Foster argues that two incidents of the respondent's continuing harassment put the University on notice that its no-contact order was ineffective, and she argues that the University's responses to those incidents were clearly unreasonable. The first of these incidents was when the respondent sent Foster a one-word text message, "Really," on March 29, 2014. R. 48-13 (Text message) (Page ID #1026). This was a clear violation of the no-contact order, which prohibited the respondent from contacting Foster "by text message," R. 44-12 (Veidlinger 3/21/14 email #1) (Page ID #780), and Foster reported it to the University immediately, R. 48-14 (Foster 3/30/14 email) (Page ID #1027). The second incident was the respondent's April 4, 2014 email to school administrators, where he refers to the Title IX investigation as a "retarded" and "specious witch hunt," and calls her "your psycho hobeast client" and a "lying slut whore." R. 48-20 (Respondent 4/4/14 email) (Page ID #1036). He also states,

[I]f you think for a minute that i am either going to miss [the karaoke outing] or abruptly depart it just cause some lying slut whore seeks baseless vindictive retribution, well youve got an inflated sense of your own influence and with that, another thing comin.  i'd recommend you protect your shrinking violet client by informing her that i will in fact be there, and if she (or you) have a problem with that, you're welcome to pound sand.

*Id.*  As University Title IX Investigator Anthony Walesby acknowledged in his deposition, the respondent appears to indicate in this email that he intends to violate or disregard the interim measures imposed on him, R. 48-5 (Walesby Dep. at 41) (Page ID #987), which barred him from "attending any social activities outside of the scheduled classes where Rebecca Foster is in attendance," R. 48-16 (Hogikyan 3/31/14 email) (Page ID #1030).

A reasonable juror could find that the University's response to these two incidents was clearly unreasonable.  Beginning with the text message, a reasonable juror would have no trouble reading that text message as an intentional violation of the University's no-contact order that should have alerted the University to the respondent's propensity not to follow its instructions, despite the respondent's insistence that the message had been meant for someone else.  Yet the University took no action but to speak with the respondent and review the same no-contact order it had already imposed.  R. 48-18 (Veidlinger 4/1/14 email) (Page ID #1033) ("I spoke with the Respondent yesterday concerning the text that he sent you on Saturday. . . . We went over the no contact and retaliation provisions and I do not expect anything like that to happen again.").  Indeed, the University did not substantively respond to Foster's expression that she was concerned for her safety, simply stating that she was "the best judge of [her] immediate needs."  R. 48-14 (Veidlinger 3/30/14 email) (Page ID #1027).

As for the respondent's vulgar April 4, 2014 email, the respondent expressly stated his intent not to follow the interim orders the University had put in place on March 31, 2014.**[9]**

---

**[9]**It should be noted that although the University implemented these interim measures on March 31, 2014, they were not in response to the respondent's March 30, 2014 text message as the University argues.  First, the record is clear that on March 28—before the respondent violated the no-contact order—University administrators had already decided to impose additional interim conditions on him.  R. 48-12 (Veidlinger & Hogikyan 3/28/14 emails) (Page ID #1023–25).  There is no indication in the record that the University decided to impose these conditions on the respondent only once he violated the no-contact order on March 29.  Second, at no point in its March 31 email to the respondent did the University mention his violation of the no-contact order or indicate that these measures were being imposed in response to the violation.  R. 48-16 (Hogikyan 3/31/14 email) (Page ID #1030).  Third, in a subsequent

Given the crude, threatening content of this email, University administrators discussed on Friday morning, April 4, whether to remove the respondent from class as it was happening at the Beverly Wilshire hotel.  Ultimately, they decided not to.  In fact, a review of the record confirms that the University took no action at all in immediate response to receiving this email.

In assessing these two incidents, it is true that a reasonable juror could regard the respondent's March 29 text-message violation as de minimis, given that the message contained only one word and no explicit threat, and could regard the April 4 email as inappropriate yet not violative of the University's orders, given that (1) the email was not addressed to Foster and (2) it only signaled the respondent's intention to violate the no-contact order *if* a certain condition were satisfied (namely, Foster showing up to the same event as him).  A juror might thereby regard the University's minimal response as commensurate with a minimal amount of harassment, as the majority does.

Yet a reasonable juror could also conclude that, in light of the respondent's extended pattern of sexual harassment, these two incidents manifested a clear intention to subject Foster to further harassment, warranting a swift and robust response from the University as a means of deterring future misconduct.  This differs from a conclusion that the University was mistaken in rejecting Foster's particular requests that in-classroom security protect her, R. 48-2 (Foster Dep. at 166, 185) (Page ID #958, 961), or that the respondent be prevented from seeing her in person, R. 48-17 (Foster 3/31/14 email) (Page ID #1032).  Title IX does not give victims the "right to make particular remedial demands," but the question remains whether the University's particular course of action was "clearly unreasonable," and the answer to the question is not clear as a matter of law. *Davis*, 526 U.S. at 648.

Indeed, there are genuine disputes of fact as to the University's responses to these two incidents that further demonstrate the inappropriateness of resolving this case on summary judgment.  First, there is a genuine dispute of material fact as to whether University

---

email to Foster on April 1, Veidlinger made clear that there would be no consequences for the respondent's violation of the no-contact order. R. 48-18 (Veidlinger 4/1/14 email) (Page ID #1033) ("I spoke with the Respondent yesterday concerning the text that he sent you on Saturday. . . . We went over the no contact and retaliation provisions and I do not expect anything like that to happen again.").  Thus, the additional interim measures set forth in the March 31 email did not address the respondent's March 29 violation of the no-contact order.

administrators—including the University's dean—agreed after receiving the respondent's April 4 email that the school simply did not have the "necessary resources" to effectuate his removal from the residency given that the program was in Los Angeles, and whether they changed their minds only after his next violation of the no-contact order that night. R. 48-24 (Foster Notes) (Page ID #1045). Such an "admission of inadequacy" would support a finding of deliberate indifference. *See Pahssen v. Merrill Cmty. Sch. Dist.*, 668 F.3d 356, 364 (6th Cir. 2012). A jury could conclude that the University believed removal was appropriate and failed to take this action, supporting Foster's claim of deliberate indifference. Second, there is a factual question as to whether the University's decision not to implement in-class security measures beyond having a school administrator watch the respondent during class was influenced by a desire not to scare off prospective students who would be observing the class that day. R. 48-2 (Foster Dep. at 166) (Page ID #958). A jury could reasonably conclude that taking less robust action in order to help recruiting evidenced deliberate indifference to the sexual harassment that Foster endured.

*The Respondent's April 4, 2014 Facebook Post.* Foster next argues that University did not respond to the April 4, 2014 Facebook-post incident, stating that after this violation of the no-contact order, "the harassment continued and escalated" and that she reported "the continued misconduct," "[y]et the school, essentially, did nothing more than restate the No Contact Order."[10] Appellant Br. at 20. On the one hand, the University immediately informed the respondent that he was prohibited from attending class the next day, and he complied. *See* R. 48-25 (Respondent 4/5/14 email) (Page ID #1047). The University also worked with hotel security to ensure that the respondent would be stopped if he tried to attend class that day. *See* R. 48-4 (Davis-Blake Dep. at 19) (Page ID #985) ("I do recall that we had conversations about the Beverly Wilshire having security and using that security to address issues as part of our contract with them."). On the other hand, in light of the respondent's pattern of noncompliance and the threatening nature of the

---

[10]At first blush, it is not clear what subsequent incidents of harassment Foster is referring to, but in the same section she clarifies that, in response to the harassment, she "requested that the Harasser be prohibited from entering the class or otherwise being present near her," and that a University administrator said, "I am inclined to agree." Appellant Br. at 20. This describes the Facebook tag incident. Foster reported the incident, and requested that the University prohibit the respondent from entering class—as Claire Hogikyan's April 5 email confirms, Foster asked the University to "disallow [the respondent] into class in the morning." R. 48-23 (Hogikyan 4/5/14 email) (Page ID #1044). Hogikyan stated she was inclined to agree with this request. *Id.*

Facebook post, a reasonable jury could conclude that the University's response to this incident was clearly unreasonable.  The University could have barred the respondent from attending commencement at this point, rather than waiting until April 10; it could have instituted measures to ensure Foster's safety in the Los Angeles area; and it could have taken further disciplinary measures against the respondent to deter him from further harassment.  A jury should decide whether the University's response was clearly unreasonable.

*The Respondent's Retaliatory Emails.*  Next, Foster argues that the University's response to the respondent's retaliatory emails after being barred from the final day of the April residency was deliberately indifferent.  A reasonable jury could reach that conclusion.  After the respondent was barred from class, he sent numerous emails to his classmates, professors, and University administrators in which he derided the investigation against him, referred to Foster in a derogatory manner, and made statements that could be construed as threats, albeit not against Foster directly.  The record contains six emails sent by the respondent between April 5 and April 9 to various individuals regarding the Title IX investigation before the University explicitly ordered him to refrain from sending these emails.  *See* R. 48-31 (Lynch 4/10/14 email) (Page ID #1062) ("[A]*ny* further harassment by you of University faculty, staff, or students—by email or otherwise—will put your receipt of a degree in grave jeopardy.") (emphasis in original).  The University had actual knowledge of each of these emails; the one email that was sent to Foster's classmates (as opposed to University employees) was "very likely" forwarded to Hogikyan by Foster.  *See* R. 48-3 (Hogikyan Dep. at 110–111) (Page ID #980) ("I believe it was forwarded to me. . . . I don't recall [by] who[m]. Very likely it would have been Rebecca Foster.").  The emails were not sent to Foster directly, but, as the University itself found with respect to the respondent's April 5 email to his classmates, they constituted retaliation against Foster for filing a complaint.  *See* R. 48-10 (OIE Investig. Rep. at 24–25) (Page ID #1019–20).  I have no difficulty concluding that these emails subjected Foster to further harassment as a continuation of the respondent's existing crusade against her.

The University discussed the possibility of removing the respondent from his University email account after he was barred from the final day of the April residency, *see* R. 48-3 (Hogikyan Dep. at 42–43) (Page ID #973), but it did not take this action.  As with Foster's earlier requests for

more robust accommodations, it was possible that taking this course of action would not have been feasible or proper in the absence of a formal finding by the University that Foster's complaint had merit. Yet the University had substantial control over the respondent's electronic communications, as evidenced by discussions about removing him from the email system, Davis-Blake's instructions to remove him from a LinkedIn group, and Mehta providing the respondent with a local WiFi password. *See Feminist Majority Found. v. Hurley*, 911 F.3d 674, 687–88 (4th Cir. 2018) (university had control over cyberharassment because, in part, harassing messages were posted "using the University's wireless network"). In my view, a jury—not this court—should determine whether the University was clearly unreasonable in allowing the respondent to continue unimpeded in his misuse of University communication systems to retaliate against Foster.

*The Respondent's Appearance at Commencement.* Foster argues that the University "should have known it needed to take more drastic actions" with respect to the respondent's foreseeable appearance at commencement. Appellant Br. at 24. Although the University undoubtedly took several tangible steps toward ensuring that the respondent would not be present—such as confirming with his lawyer that he would not be present, stationing a plainclothes law enforcement officer at the residence where Foster stayed during commencement, and conducting a "threat assessment" of the respondent—a reasonable jury could conclude that its efforts were clearly unreasonable. The University could have taken numerous further responses, from instituting a no-trespass order at the Executive Residence against the respondent to placing him on interim suspension after receiving word that he was flying to Ann Arbor for graduation, in direct violation of the University's instruction. Furthermore, the University never restricted the respondent's presence on campus generally, but instead it barred him only from attending "commencement activities." And any significance the University ascribes to the respondent's lawyer's assurances is misplaced, given that the respondent himself had already once promised to stop violating the no-contact order (after the text-message violation), and then proceeded to break this promise. A jury could reasonably conclude that taking the respondent or his lawyer at their word, in light of these circumstances, was clearly unreasonable.

Not only could a reasonable jury find the University's response to each of these incidents to be clearly unreasonable, but also it could find that the University's inadequate response

"'cause[d] [Foster] to undergo'" harassment or "'ma[d]e [her] liable or vulnerable'" to it. *Davis*, 526 U.S. at 645 (citation omitted). Here, a reasonable juror could find that the University's lackluster response to the respondent's initial violation of the no-contact order and his threat to violate it again emboldened the respondent to continue and escalate his harassment of Foster, which included a threatening and offensive Facebook post, a series of vulgar emails to University officials, and crude emails to other students that the University itself concluded were retaliatory. Similarly, the University's response to the April 4, 2014 Facebook post and the retaliatory emails could have emboldened the respondent to attend commencement activities despite the University's instructions, making Foster vulnerable to further harassment. Likewise, the University's failure to bar the respondent from his school email account could have led to further retaliatory emails. Finally, a reasonable juror could find that the University's failure to bar the respondent from campus entirely (as opposed to only Ross School commencement activities) made Foster vulnerable to further harassment when the respondent in fact turned up on campus and came into contact with Foster at the Executive Residence. These are just a few examples. Although a court may grant summary judgment on the issue of causation when warranted, "[o]rdinarily, causation is a question to be resolved by a jury." *Bailey v. Floyd Cnty. Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997). That is the case here.

By the majority's telling, the University was not deliberately indifferent to the sexual harassment and retaliation Foster endured; each time Foster reported the respondent's misconduct to the University, it "adopted escalating measures proportionate to the misconduct." Maj. Op. at 8. But, as set forth above, the only way to reach that conclusion is by stepping into the jury's shoes. It requires weighing the evidence and its significance, determining the credibility of testimony, and drawing inferences against Foster, even though she is the non-moving party. None of that is appropriate at the summary judgment stage. A reasonable juror could take that very same evidence and conclude that the University implemented an ineffective initial response and then belatedly and inadequately updated that response when faced with clear evidence—from the respondent himself—that the respondent would continue to disregard the University's instructions. That juror could reasonably find that in doing so the University exhibited deliberate indifference.

\*\*\*

Looming over the majority's decision is the specter of a day "in which two different juries will find that the same university loses coming and going over the same incident—by insufficiently protecting the rights of the victim in one case and by insufficiently protecting the rights of the accused in the other." Maj. Op. at 13. In other words, the majority is concerned that a contrary holding would render schools liable to both the victims and the perpetrators of sexual harassment based on the same response: the victims for deliberate indifference under Title IX and the perpetrators (or accused perpetrators) for violations of their procedural due process rights. But this false dilemma is an unwarranted distraction. There is nothing untoward about a school being liable to both the victim of sexual harassment and the harasser in the appropriate circumstances, and in any event this case implicates no such risk of dual liability.

First, consider an obvious example. Students A and B are classmates at a state college that receives federal funding. Student B sexually assaults Student A at the college dormitory where they both reside. Student A reports the assault to the college, but the college does not respond to the allegation, allowing Student B to continue residing in the dormitory. When Student A reports a second sexual assault by Student B, the college realizes its mistake and this time immediately expels Student B without a hearing. The college's failure to respond to the first assault would result in damages liability to Student A under Title IX: the college had actual knowledge of the assault and its failure to respond was clearly unreasonable, leading to the second assault. *Davis*, 526 U.S. at 645, 648. At the same time, the immediate expulsion would likely have violated Student B's procedural due process rights because due process requires notice and an opportunity to be heard before a non-academic disciplinary expulsion. *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 634 (6th Cir. 2005). Such a hypothetical college would appropriately lose in suits brought by the victim and by the harasser, on the grounds of two independent wrongs committed by the college.

This outcome is also possible (and rightly so) in less extreme cases. As explained above, Title IX damages for student-on-student sexual harassment are available in cases where the school in fact responds to the harassment but its response is nevertheless clearly unreasonable. *See Davis*, 526 U.S. at 648. And procedural due process sometimes imposes particular requirements on the

hearings that schools must afford accused students, such as an opportunity to cross-examine witnesses, *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 400–04 (6th Cir. 2017), and an unbiased decisionmaker, *Doe v. Miami Univ.*, 882 F.3d 579, 601 (6th Cir. 2018). A belated response that makes the victim vulnerable to further harassment in the interim could be deliberately indifferent if a jury concluded that the lateness of the response was clearly unreasonable, subjecting the school to Title IX liability. The same school, however, could lose a suit to the harasser if, when the school belatedly did sanction the harasser, it did so by employing a biased decisionmaker or failed to afford the harasser an opportunity to cross-examine witnesses if the circumstances called for it.

Whatever tension there is in this sort of possible dual liability for schools responding to sexual harassment is superficial. Schools subject to both Title IX and the Due Process Clause have independent obligations to the victims of sexual harassment and to the alleged harassers. They are obliged to respond without deliberate indifference to the victims of sexual harassment, and they are independently obliged to afford procedural protections to the accused. It is naïve to suggest that these schools are incapable of failing on both fronts, and it is not for this court to bend the rules of institutional liability under Title IX so that schools may better avoid that outcome. It is perfectly proper to expect schools to meet their obligations under Title IX to victims of sexual harassment while affording due process to the harassers.

As for this case, concluding that the University's response to the respondent's sexual harassment of Foster was not clearly unreasonable as a matter of law would not put educational institutions in an "impossible position" as amici contend. Amici Curiae Br. at 1. Nor would it encourage universities to "expel first and ask questions later," as the majority opines. Maj. Op. at 13. First, the University had options available to it short of expulsion or even suspension. No one is suggesting that the following examples of available interim responses would have violated the respondent's procedural due process rights under the circumstances of this case: (1) suspending his email privileges; (2) requiring him to complete the April residency in Ann Arbor (as opposed to making that only an option); (3) removing him from class earlier than the University ultimately did; and (4) barring him from campus during commencement (as opposed to simply barring him from commencement activities). Second, even if the University had chosen to suspend or expel the respondent after taking some of its interim measures, it is far from clear that this would have

run up against the respondent's procedural due process rights. "The amount of process due will vary according to the facts of each case," *Flaim*, 418 F.3d at 634, and our cases largely involve the question of what process is due to students accused of, but contesting whether they are responsible for, a violation of school policy (e.g., sexual misconduct) in the first instance, *see, e.g.*, *Miami Univ.*, 882 F.3d 579. In such a context, procedural due process protections are more robust, requiring, for example, an opportunity to cross-examine witnesses at least where credibility is a key issue in the cases. *See Univ. of Cincinnati*, 872 F.3d at 400–04. Here, in contrast, there is no dispute that the respondent had violated the school's no-contact order, and he explicitly stated his intention to do so again. The more drastic response would not have been based on the unproven allegations of misconduct, but on the undisputed violation of school policy that occurred thereafter. To reiterate, Foster is not arguing that the University was deliberately indifferent in failing to expel the respondent immediately upon her allegation that he sexually harassed her; she is arguing that the University was deliberately indifferent in failing appropriately to adjust its response after the respondent signaled his unwillingness to comply with the University's instructions and proceeded to engage in an escalating campaign of harassment and retaliation against her.

Setting the above aside, let us remember the posture in which we find ourselves. Denying the University summary judgment is a far cry from concluding ultimately that it acted with deliberate indifference, let alone that Foster has proved she is, in fact, entitled to damages. It simply represents a judicial determination that the victim of sexual harassment has raised questions of fact that should be resolved by the jury, not this court. *Anderson*, 477 U.S. at 249 ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."). That fact gets lost in the majority's ominous warnings of dual liability—and in its opinion more broadly. Foster presented sufficient evidence of the University's deliberate indifference under *Davis* to establish a genuine dispute of material fact. That is the point. The evidence was not so one-sided as to compel a result in favor of either party, and thus the case should have been for the jury, not this court, to decide. Accordingly, I respectfully dissent.

―――――――――――

**DISSENT**

―――――――――――

WHITE, Circuit Judge, dissenting.  Although I do not agree with the dissent's discussion of the University's response to the March 29 "really" text, I otherwise join Judge Moore's opinion and emphasize the observation that the majority's seeming application of a good-faith standard is unmoored from any applicable legal precedent. *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 648 (1999).